IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PHILLIP G. FOGG, JR., MARQUIS
COMPANIES, I, INC., F&W ASSOCIATES,
INC., MARQUIS SUITES ASSISTED LIVING          CV-06-160-ST
COMMUNITIES, INC., and WILSONVILLE
HEALTHCARE PROPERTIES, LLC,                   OPINION AND ORDER

               Plaintiffs,

    v.

GARY A. WART,

_____Defendant._____

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff Phillip G. Fogg, Jr. ("Fogg") is a resident of Portland, Oregon.  Plaintiff Marquis

Companies, I, Inc. ("Marquis"), is a corporation duly organized and existing under the laws of

the State of Oregon with its principal place of business in Milwaukie, Oregon.  Marquis and its

affiliated companies ("Marquis Entities") own and operate assisted living, skilled nursing and

Alzheimer's care facilities in Oregon, Montana, Idaho and California.  The affiliated companies

1 - OPINION AND ORDER

are: (1) plaintiff F&W Associates, Inc. ("F&W"), a corporation duly organized and existing under the laws of the State of Oregon with its principal place of business in Milwaukie, Oregon; (2) plaintiff Marquis Suites Assisted Living Communities, Inc. ("Marquis Suites"), a corporation duly organized and existing under the laws of the State of Oregon with its principal place of business in Milwaukie, Oregon; and (3) plaintiff Wilsonville Healthcare Properties, LLC ("WHP"), a limited liability company duly organized and existing under the laws of the State of Oregon with its principal place of business in Milwaukie, Oregon. Defendant Gary A. Wart ("Wart") is a resident of the State of Washington.[1]

Fogg and Wart were co-owners of the Marquis Entities until Wart sold all of his ownership interest to the Marquis Entities in a Buy-Out Agreement. The parties seek a declaratory judgment to resolve the interpretation of certain provisions in that Buy-Out Agreement. In particular, they disagree as to whether Wart has the right to share in the distribution of profit from an institutional pharmacy business established by Fogg with several third parties which sells pharmacy products to the Marquis Entities.

This court has subject matter jurisdiction pursuant to 28 USC § 1332 based on complete diversity of citizenship between each plaintiff and the defendant and on an amount in controversy which exceeds $75,000, exclusive of interest and costs. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket # 13).

---

[1] Although the Complaint states that Wart is a "resident" of the State of Washington, a natural person's state citizenship is determined by the individual's "state of domicile," which is where the person "resides with the intention to remain or to which [he or] she intends to return." *Kanter v. Warner-Lambert Co.*, 265 F3d 853, 857 (9th Cir 2001). Since plaintiffs have not disputed Wart's citizenship, the court will assume that he is a citizen of the State of Washington for purposes of this Motion for Summary Judgment.

Wart has filed a Motion for Summary Judgment (docket # 16) on the ground that the parties' Buy-Out Agreement entitles him to share in the "Pharmacy Distributions" received by plaintiffs from a "Pharmacy Joint Venture."  For the reasons that follow, that motion is denied.

## LEGAL STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *Id* at 631.

///

///

## FACTS

A review of the parties' submissions, including affidavits, declarations, and deposition excerpts, reveals the following facts.[2]

Fogg and Wart owned interests in businesses involved in long-term care and assisted living facility industry, including the Marquis Entities. Between 1999 and December of 2002, Marquis owned an interest in SNALF, a business entity engaged in the e-commerce provision of services and products to the long-term care industry. Fogg Affidavit, ¶¶ 11-21. Marquis, as well as Wart and Fogg, invested considerable funds in SNALF. *Id* at ¶¶ 11-21, 31-34. However, it became evident that additional funds, expertise and momentum were necessary if SNALF were to succeed. *Id* at ¶ 16. By late 2001, Genesis Health Ventures, Inc. ("GHV"), a nationwide provider of services and products to the health care industry, also invested in SNALF. *Id* at ¶ 21. However, Fogg believed that Marquis could recover its investment only if GHV purchased Marquis' interest or if SNALF became wildly successful. *Id* at ¶ 34.

Meanwhile, between 2000 and 2002, Marquis purchased all the pharmaceutical products for its nursing homes through GHV's wholly-owned institutional pharmacy, NeighborCare Portland ("NeighborCare"). *Id* at ¶ 22. Recognizing that GHV's interest in continuing the pharmaceutical supply relationship might provide a secondary means for Marquis to recoup the almost certain SNALF losses, Fogg engaged GHV in negotiations to create a joint venture between Marquis and NeighborCare. *Id* at ¶¶ 27-29, 54-56. Wart did not participate in these negotiations. Wart Decl., ¶ 32.

---

[2] Both parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit, declaration or page(s) of the deposition transcript. All other citations are to the exhibit number of the parties' submissions.

The joint venture between Marquis and NeighborCare was conceived as a "pharmacy within a pharmacy." Fogg Aff., ¶ 24. It would be created by forming a new entity in which Marquis and NeighborCare (or their designated entities) would be equity partners. *Id.* This new entity would function operationally out of NeighborCare's existing pharmacy warehouse and continue to provide daily pharmaceutical supplies and services to residents in Marquis' facilities. *Id.* NeighborCare would manage the pharmacy for which it would be paid a monthly fee. *Id.* It would contribute all personal property, goods and salable inventory, accounts receivable and liabilities, contractual rights and necessary intangible property, and also lease all necessary employees to the joint venture. *Id.* In turn, Marquis would commit to purchasing all pharmaceutical products from the new entity subject to applicable resident rights. *Id.* Through this pharmacy joint venture, Fogg hoped to leverage Marquis' buying power with NeighborCare into a financial interest.[3] *Id* at ¶ 60.

By October 2001, Wart decided to sell his equity interests in the Marquis Entities. *Id* at ¶ 36. Discussions between Fogg and Wart, through their attorneys, for the sale of Wart's equity interest to plaintiffs continued through the beginning of 2002. *Id* at 37. At least 15 drafts of a Buy-Out Agreement were exchanged between December 2001 and March 2002 when the deal closed. *Id.* The Buy-Out Agreement was executed on March 28, 2002, with an effective date of January 1, 2002. *Id* at ¶¶ 38, 52; Conable Decl., Exhibit 1. Under the Buy-Out Agreement, plaintiffs purchased Wart's equity interests in the jointly owned businesses for an initial cash payment plus additional consideration if and when contingent future events occurred, including a

---

[3] Although GHV's motivation for engaging in these negotiations is not disclosed by the record, Fogg maintains GHV was willing to relinquish a portion of NeighborCare's profits rather than risk losing Marquis' pharmaceutical business to a competitor. *Id* at ¶ 23.

percentage of "any Pharmacy Distribution received by" the Marquis Entities "[i]f the Marquis Parties and any third party form the Pharmacy Joint Venture." Conable Decl., Exhibit 1, ¶¶ 3, 6, & 9.

The negotiations to create a joint venture between Marquis and NeighborCare were ultimately unsuccessful because GHV wanted Marquis to purchase an ownership interest in the joint venture and be subject to future capital calls. *Id* at ¶ 27. Marquis would not concede to those pivotal terms which required it to commit to financial contributions. *Id* at ¶¶ 27-28, 35, 54. SNALF did not succeed and ceased operation on November 30, 2002. *Id* at 53. SNALF and GHV worked together to wind down the business and assume liabilities between them. *Id*. SNALF was dissolved effective December 31, 2002. *Id*.

On January 28, 2004, Fogg, his brother (Steven C. Fogg),[4] and David Lewis[5] formed Consonus Pharmacy Services, LLC, ("Consonus"). Fogg Affidavit, Exhibits 13, 14. Consonus was established "to own and operate an institutional pharmacy business . . . that provides services to facilities owned and/or operated, directly or indirectly, by the Members or any other third party pursuant to certain service contracts." Conable Decl., Exhibit 3. On October 18, 2004, the Roderick Family, LLC, Kris Campbell, Terry Mace, and Farmington Center's, Inc. were added as limited liability company members of Consonus. Fogg Affidavit, Exhibit 14, Bates 200507, 200527-200531. Unlike Marquis' attempted joint venture with GHV/NeighborCare that had relied on NeighborCare's expertise, suppliers, infrastructure and management, Consonus is not a joint venture with any other entity; it is an operation built from

---

[4] Steven Fogg is the chief financial officer of Marquis. Steven Fogg Affidavit, ¶¶ 2-3.

[5] At the time of the Buy-Out Agreement, David Lewis was president of Rehab Specialist, Inc., a company owned by Fogg that provides rehabilitation services for Marquis' resident population. Steven Fogg Affidavit, ¶ 5.

the ground up and has its own pharmacy.  *Id* at ¶¶ 60-61.  In building Consonus, its members

incurred $2,000,000 of debt, personally guaranteed by Fogg and his brother.  *Id* at ¶ 61.  Wart

did not contribute financially to Consonus.  *Id* at ¶¶ 62, 64.

On October 22, 2004, Wart formally requested, as due under the Buy-Out Agreement, his

share of the Consonus "Pharmacy Distributions," together with "copies of all organizational and

other agreements relating to the Pharmacy Joint Venture," related correspondence, detailed

schedules of the Pharmacy Distributions received to date, how each Pharmacy Distribution was

computed, and the gross revenue derived.  Conable Decl., Exhibit 4.  On October 27, 2004,

plaintiffs responded to Wart that they did not recognize his entitlement to any distributions from

Consonus and refused to provide him with any of the information demanded.  *Id* at Exhibit 5.  At

the time of the demand, Consonus had made no distributions.  *Id*.

On February 3, 2006, plaintiffs filed this Complaint against Wart, seeking declaratory

judgment to resolve the parties' conflicting interpretations of Section 9 of the Buy-Out

Agreement.  On March 23 and April 12, 2006, respectively, Consonus wrote distribution checks

to its members.  Conable Decl., Exhibit 6.

## DISCUSSION

The parties dispute whether any payment is due to Wart under the Buy-Out Agreement as

a "Pharmacy Distribution."  The purchase price payable to Wart includes "Additional

Consideration" beyond the minimum price, if and when certain events occur.  Conable Decl.,

Exhibit 1, ¶¶ 3, 6.  The Buy-Out Agreement defines "Additional Consideration" as "the cash,

SNALF Shares, GHV Shares and/or tangible and intangible property to be paid, issued or

transferred to Seller [Wart] pursuant to Sections 6, 7 and/or 9 of this Agreement in addition to the Minimum Purchase Price." *Id* at ¶ 1.1(a).

Section 6 of the Buy-Out Agreement requires the Marquis Parties to prepare and deliver to Wart an Additional Consideration Calculation no later than 90 days after the receipt of any payments or property which are the subject of Additional Consideration. The Agreement also establishes certain procedures allowing Wart to object to the calculation.

Section 7 requires Marquis to "pay and/or transfer to [Wart], as Additional Consideration, 49.67% of the proceeds received by Marquis from the sale of any SNALF Shares, including a sale to GHV pursuant to the SNALF Option."

Section 9, the key disputed provision, is entitled "Pharmacy Joint Venture," and provides in relevant part as follows:

> 9. <u>Pharmacy Joint Venture</u>. The Marquis Parties have been engaged in negotiations with a third party for the organization of the Pharmacy Joint Venture. If the Marquis Parties and *any third party* form the Pharmacy Joint Venture, the Marquis Parties will pay Seller [Wart], as Additional Consideration, a portion of any Pharmacy Distribution received by them, calculated in accordance with Sections 9.1 through 9.6. . . .

(Emphasis added).

"Pharmacy Joint Venture" is defined in Section 1.1(gg) as "a joint venture or other entity, formed by any or all of the Marquis Parties and an unrelated third party for the purposes of engaging in the Institutional Pharmacy Business." "Marquis Parties" is defined in Section 1.1(z) to mean "Marquis and its Subsidiaries, Marquis Suites and its Subsidiaries, and/or Fogg and his Subsidiaries." "Pharmacy Distribution" is defined in Section 1.1(ff) as "cash, tangible property and/or intangible property paid or transferred to the Marquis Parties by or through the Pharmacy

Joint Venture, irrespective of the source from which the Pharmacy Joint Venture acquired the cash, tangible property or intangible property."

The parties disagree as to the meaning of "any third party" in Section 9. Wart asserts that it is an unambiguous term which should be given its ordinary meaning to include *any* "third party" who enters into a "Pharmacy Joint Venture" with the Marquis Parties, and not just GHV and its subsidiaries. Plaintiffs respond that, in the context of the Buy-Out Agreement as a whole and in light of extrinsic evidence, "any third party" refers only to GHV and its subsidiaries with whom the Marquis Entities were engaged in negotiations to form a joint entity.

## I.    **Legal Standard**

According to Section 17.11, the Buy-Out Agreement is "governed by, and construed in accordance with," Oregon law. Oregon subscribes to the objective theory of contracts. *Holdner v. Holdner*, 176 Or App 111, 120, 29 P3d 1199, 1203 (2001), *review denied*, 334 Or 288 (2002). "In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts." *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 354, 709 P2d 727, 730-31 (1985) (citations omitted).

In Oregon, contract interpretation is a question of law for the court. *Anderson v. Jensen Racing, Inc.*, 324 Or 570, 575, 931 P2d 763, 765 (1997). To interpret a disputed contractual provision, the court must determine whether the provision is ambiguous. *Nixon v. Cascade Health Services, Inc.*, 205 Or App 232, 238, 134 P3d 1027, 1030 (2006) (citation omitted). The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation. *Id* (citation omitted). If a contract is deemed ambiguous, it is then left to "the trier of fact [to] ascertain the intent of the parties and construe the contract consistent with the

intent of the parties." *Yogman v. Parrott*, 325 Or 358, 363, 937 P2d 1019, 1022 (1997) (*en*

*banc*), citing *Pac. First Bank v. New Morgan Park Corp.*, 319 Or 342, 347-48, 876 P2d 761, 764

(1994); *see also Milne v. Milne Constr. Co.*, 207 Or App 382, 389, 142 P3d 475, 479 (2006)

(citation omitted) ("[t]he meaning of an ambiguous contract term is a question of fact").

      A.     <u>Use of Extrinsic Evidence To Determine Ambiguity</u>

      In diversity cases, federal courts are bound by the substantive law of the forum state. The

question of extrinsic evidence in the interpretation of a contract is one of substantive law.

*Abercrombie v. Hayden Corp.*, 320 Or 279, 286, 883 P2d 845, 850 (1994). Thus, Oregon law

determines the role of extrinsic evidence in contract interpretation.

      Whether extrinsic evidence can be used to determine if the terms of a contract are

ambiguous is an unsettled question in Oregon. In *Abercrombie*, the Oregon Supreme Court held

that "[t]he trial court may consider parol and other extrinsic evidence to determine whether the

terms of an agreement are ambiguous." *Id*, 320 Or at 292, 883 P2d at 853. In reaching this

conclusion and without further analysis, the court relied on ORS 42.220, which provides: "In

construing an instrument, the circumstances under which it was made, including the situation of

the subject and of the parties, may be shown so that the judge is placed in the position of those

whose language the judge is interpreting."

      Three years after *Abercrombie*, the Oregon Supreme Court developed a three-step

analysis to interpret disputed contractual provisions. *Yogman*, 325 Or at 361-66, 937 P2d at

1023. At step one, "the court examines the text of the disputed provision, in the context of the

document as a whole. If the provision is clear, the analysis ends." *Id*, 325 Or at 361, 937 P2d at

1021. If, however, the text of the agreement is ambiguous when viewed in context of the entire

agreement, the court proceeds to step two, examining the extrinsic evidence of the contracting

parties' intent. *Id*, 325 Or at 363-64, 937 P2d at 1022. Where the first two steps have not solved

the ambiguity, at step three the court relies on appropriate maxims of construction. *Id*, 325 Or at

364-65, 937 P2d at 1022-23. By deferring the examination of extrinsic evidence to step two,

*Yogman* strongly implied that no extrinsic evidence may be examined at step one, which

arguably contradicts *Abercrombie*.

       In subsequent decisions, the Ninth Circuit and the Oregon Court of Appeals have

disagreed on whether *Yogman* overruled *Abercrombie*. According to the Ninth Circuit, *Yogman*

overruled *Abercrombie*. *Webb v. Nat'l Union Fire Ins. Co. Of Pittsburgh*, 207 F3d 579, 581-84

(9th Cir 2000). That conclusion was based on the Ninth Circuit's perception that "the consensus

among Oregon courts is that they are opposed to considering extrinsic evidence to determine the

parties' intent unless an ambiguity is apparent from the four corners of the document." *Id* at 582,

citing *Yogman, supra*. *Webb* did not acknowledge that other Oregon courts continued to apply

*Abercrombie* after *Yogman*. *See Oregon Trail Elec. Consumers Coop., Inc.,* 168 Or App 466,

476-77 n 8, 7 P3d 594, 602 n 8 (2000); *Klamath Pac. Int'l, Inc. v. Weyerhauser Co.*, 1999 WL

984056 at * 6 (D Or 1999). The Ninth Circuit subsequently addressed, but did not resolve, the

conflict between *Webb* and various Oregon Court of Appeals cases. *Arboireau v. Adidas-*

*Salomon AG*, 347 F3d 1158, 1164 n 4 (9th Cir 2003) (the provision at issue was not to be

ambiguous even if the court considered extrinsic evidence). However, more recently, the

Oregon Court of Appeals has concluded that "*Abercrombie* survived *Yogman*." *Batzer Constr.,*

*Inc. v. Boyer*, 204 Or App 309, 315-16, 129 P3d 773, 777, *review denied*, 341 Or 366, 143 P3d

239 (2006).

Federal district courts are bound by the Ninth Circuit's interpretation of Oregon law on extrinsic evidence until the Oregon Supreme Court decides the issue.  *Brewster v. Shasta Co.*, 112 F Supp 2d 1185, 1188 n 5 (ED Cal 2000), *aff'd*, 275 F3d 803 (9th Cir 2001), *cert. denied*, 537 US 814 (2002).  Although the Oregon Supreme Court has not decided this issue, this court believes that the Ninth Circuit's approach in *Webb* and Oregon Court of Appeals' approach in *Batzer Constr., Inc.* can be reconciled as ultimately leading to the same standard on the admissibility of extrinsic evidence at step one of the *Yogman* analysis.

As interpreted by the Oregon Court of Appeals, "*Abercrombie* does not stand for the proposition that any extrinsic evidence may be considered in determining whether a term is ambiguous.  Rather, *Abercrombie*'s reliance on ORS 42.220 as support for its statement makes clear that the extrinsic evidence that may be considered is limited to the circumstances under which the agreement was made."  *Batzer Constr., Inc.*, 204 Or App at 314-15, 129 P3d at 777, citing *City of Eugene v. Monaco*, 171 Or App 681, 687 n 7, 17 P3d 544, 547 n 7 (2000), *review denied*, 332 Or 240, 28 P3d 1175 (2001).  Similarly, even though *Webb* held that no extrinsic evidence can be considered by the court at step one of the *Yogman* analysis, it acknowledged that under ORS 42.220, Oregon courts will consider "the circumstances under which it was made, including the situation of the subject and of the parties" so that "the judge is placed in the position of those whose language the judge is interpreting."  207 F3d at 582 n 1.  *Webb* found that ORS 42.220 did not apply in that particular case because the extrinsic evidence at issue did not relate to the circumstances under which the contract was made.  Furthermore, as recognized by the Oregon Court of Appeals, any inconsistency between *Abercrombie* and *Yogman* is "illusory" as *Yogman* was presented with no evidence of the circumstances underlying the

contract at issue and, therefore, "did not have the opportunity to consider where in its three-step framework such evidence could properly be considered." *Batzer Constr., Inc.*, 204 Or App at 316, 129 P3d at 779.

This court concurs with the analysis by the Oregon Court of Appeals. Thus, at step one of the *Yogman* analysis, this court may examine extrinsic evidence limited to the circumstances under which the contract was made.

## II.    <u>Analysis</u>

Wart argues that Section 9 entitles him to a share of the "Pharmacy Distribution" from Consonus as "Additional Consideration" because one of the "Marquis Parties" (Fogg) and "any third party" (Consonus) formed a "Pharmacy Joint Venture."

Plaintiffs counter that Section 9 is ambiguous because it is subject to another reasonable interpretation that excludes Consonus because the GHV/NeighborCare Joint Venture was the only "Pharmacy Joint Venture" being discussed and negotiated at the same time as the Buy-Out Agreement. They also assert that "Pharmacy Joint Venture" is an ambiguous term.

### A.    <u>Plain Text</u>

The problem with Section 9 is that the first sentence uses different language than the second sentence. The first sentence of Section 9 states that "[t]he Marquis Parties have been engaged in negotiations with *a* third party for the organization of the Pharmacy Joint Venture" (emphasis added). Wart admits that this sentence addresses negotiations between the Marquis Parties and GHV/NeighborCare. In contrast, the second sentence of Section 9 does not refer to "*a* third party," but instead states: "If the Marquis Parties and *any* third party form the Pharmacy Joint Venture, the Marquis Parties will pay Seller [Wart], as Additional Consideration, a portion

of any Pharmacy Distribution received by them, calculated in accordance with Sections 9.1

through 9.6" (emphasis added).

On its face, Section 9 is ambiguous. The first sentence clearly refers to a specific party

readily identifiable by having already engaged in negotiations with the Marquis Parties before

the Buy-Out Agreement was signed. In contrast, the second sentence, through its indefinite

pronoun ("*any* third party") broadens the application of Section 9 beyond the specific party

referenced in the first sentence.

Wart focuses solely on the second sentence and urges the court to give "any" third party

the broad meaning of "every" third party. Oregon courts have uniformly construed the term

"any" in contracts and statutes as a term of expansion rather than one of exclusion. *Fleming v.*

*United States Auto. Ass'n.*, 329 Or 449, 456, 988 P2d 378, 382 (1999) (*en banc*), *opinion*

*modified on other grounds on recons'n by* 330 Or 62, 996 P2d 501 (2000) (*en banc*) ("any in this

context is synonymous with 'every'"); *Totten v. New York Life Ins. Co.*, 298 Or 765, 771-72, 696

P2d 1082, 1086-87 (1985) (*en banc*) ("the parties by agreeing upon the term 'in any aircraft'

have given the exclusion clause a broad meaning"); *Argonaut Ins. Co. v. Ketchen*, 243 Or 376,

382, 413 P2d 613, 616 (1966) ("any" means "every"). However, as noted in *Dickinson v. Leer*,

255 Or 274, 276-77, 465 P2d 885, 887 (1969) (*en banc*), relied on by *Fleming*, the word "any" is

"a word that has several meanings" and the applicable meaning may vary based on the context.

Therefore, this court is not bound by a single interpretation of the word "any" and cannot simply

ignore the first sentence of Section 9 to the exclusion of the second sentence.

Wart also points to the consistent use of the definite article "the" to refer to "*the*

Pharmacy Joint Venture" within Section 9, which he believes can only refer to the definition of

"Pharmacy Joint Venture" in the Buy-Out Agreement.  That definition is not limited to the

GHV/NeighborCare joint venture.  However, another equally reasonable interpretation is that

"the" refers not to any "Pharmacy Joint Venture" as defined by the Buy-Out Agreement, but

refers to *the* specific GHV/NeighborCare joint venture.

### B.    Context of the Entire Agreement

Because the text of Section 9 is ambiguous, this court must consider Section 9 in the

context of the rest of the Buy-Out Agreement.  Doing so, however, does not reconcile the

ambiguity.

In particular, Marquis asserts that Consonus is not a "Pharmacy Joint Venture" because it

is not a joint venture as that term is used in the industry or as defined in the Buy-Out Agreement.

First of all, the specific definition in the Buy-Out Agreement trumps the industry definition.

Secondly, the "Pharmacy Joint Venture" definition in the Buy-Out Agreement does not limit the

reference in Section 9 to only joint ventures, as that term is understood in the industry, but more

broadly refers to "a joint venture or other entity."  Consonus, an LLC, is just such another type

of entity.

Furthermore, a "Pharmacy Joint Venture" must be formed by one or more of the Marquis

Parties and "an unrelated third party."  That could be read narrowly as  to mean one specific

unrelated third party or broadly to include any unrelated third party.  The term "unrelated" also is

somewhat ambiguous.  Although "unrelated" clearly includes parties that have no business

affiliation with the Marquis Entities, the Marquis Parties include Fogg, an individual.  As to

Fogg, "unrelated" could mean unrelated by blood and exclude an entity formed with his brother,

as with Consonus.

15 - OPINION AND ORDER

**C.    Circumstances Under Which The Buy-Out Agreement Was Made**

As discussed above, it is also appropriate to consider extrinsic evidence of the

circumstances under which the Buy-Out Agreement was made.  Under ORS 42.220, such

evidence includes "the situation of the subject and of the parties."  The opaqueness of this

statutory language has been somewhat clarified by subsequent case law.  It "appears" to include

the "content of discussions during contract negotiations."  *Nixon*, 205 Or App at 241 n 10, 134

P3d at 1032 n 10.  It also includes prior drafts, one party's statement and the other party's

"silence in response to it" underlying the formation of the contract.  *Batzer Constr., Inc.*, 204 Or

App at 320-21, 129 P3d at 780-81 (citation omitted).  However, it excludes "later statements

about what the contract means."  *Webb*, 207 F3d at 582 n 1.

**1.    Inadmissible Evidence**

Certain extrinsic evidence relied upon by the parties cannot be considered because it

either is inadmissible for lack of authentication or does not constitute evidence of the

circumstances surrounding the making of the contract.

Plaintiffs submit correspondence between the parties around the time the Buy-Out

Agreement was signed.  In particular, Fogg's Affidavit attaches a March 11, 2002 email from

Stephen Fogg to Randy Nathanson sent at 10:10 a.m. which assumes that the Buy-Out

Agreement will close on March 31, 2002, and that the Pharmacy Joint Venture will be created on

December 31, 2002.  Fogg Affidavit, Exhibit 10, Bates Nos. 100180-181.  Plaintiffs contend that

this email clearly refers to the Marquis-GHV/NeighborCare joint venture, which was the only

pharmacy joint venture being negotiated by Marquis at that time, proving that the parties

intended it to be the only "Pharmacy Joint Venture" covered by Section 9.  However, Fogg was

neither an author nor recipient of this email exchange.  Absent such personal knowledge, Fogg's Affidavit does not comply with the authentication requirement of FRE 901 or otherwise provide a foundation for admission of the email.

The parties also offer Wart's declaration and Fogg's affidavit describing their subjective intent and state of mind at the time they signed the Buy-Out Agreement.  Fogg states the parties intended to pay Wart additional consideration for profit only from the joint venture with GHV/NeighborCare and not from any subsequent entity he set up with anyone else and without Wart's financial contribution, such as Consonus.  Wart counters that the intent of the parties was to compensate him a percentage of the profits arising from the corporate opportunity of selling pharmaceutical products on a wholesale basis to Marquis, and that Consonus fits that description.  However, these statements are merely the unexpressed subjective intent of the parties.  As such, they are not admissible extrinsic evidence to determine ambiguity of a contract and must be disregarded at this juncture.

### 2.    **Admissible Evidence**

Extrinsic evidence which may be considered includes dealings between the parties which preceded the Buy-Out Agreement, early drafts of the Agreement, statements by the parties prior to closing, and the purpose of the Agreement.

Plaintiffs contend that the purpose of the Agreement is quite clear.  It was drafted in expectation of the consummation of a Pharmacy Joint Venture between Marquis and GHV or one of its affiliates.  That entity would distribute funds to Marquis to repay its investment in SNALF as a type of kickback arrangement.  According to Fogg, the Agreement addressed the ability of Wart to obtain a portion of this corporate opportunity, not a portion of some later

17 - OPINION AND ORDER

corporate opportunity created by Fogg by investing his own money in some other entity with a different party to sell pharmaceutical products wholesale to Marquis.

Plaintiffs highlight the differences between Consonus and the Marquis -GHV/NeighborCare joint venture. Consonus is an independent, stand-alone institutional pharmacy created from the ground up and funded with loans personally guaranteed by Fogg and his brother, rather than a renegotiation of the existing pharmaceutical relationship between provider (GHV) and customer (Marquis) with no financial risk to the latter in an attempt to recoup some of the SNALF losses. Plaintiffs contend that it would be "nonsensical from a business prospective" to allow Wart to obtain a part of the Consonus profits without sharing in the financial risks associated with Consonus. Otherwise, they assert that they would have taken additional precautions to protect themselves, such as including a clause in Wart's separate Non-Competition Agreement barring him from participating in the pharmacy business.

As further proof of this alleged purpose for Section 9, plaintiffs point to an early valuation analysis dated October 17, 2001, prepared by Fogg's staff, confirming that he considered all of the then-pending contingent liabilities and assets that might affect the buy-out negotiations. Fogg Aff., ¶ 41 & Exhibit 6. It included the SNALF potential liability and the Pharmacy Ancillary company value based on the financial potential of the joint venture with GHV. *Id.* A higher value would have been assigned had Fogg expected Wart to have an interest in a future enterprise such as Consonus. *Id.*

This evidence certainly supports Fogg's position. However, an alternative purpose for Section 9 is simply to maximize the amount of Additional Consideration that Wart would receive in exchange for his shares in the Marquis Entities. According to Wart, SNALF was controlled

by Fogg; he was not involved in its day-to-day operations or in the negotiations with GHV. Wart Decl, ¶ 1. He had discussions with Fogg and others at Marquis about the potential pharmacy joint venture with GHV, including discussions about various forms that the business might take in order to maximize the profitability of the business. *Id* at ¶ 3. Therefore, he insisted that the language of the Buy-Out Agreement reflect that the "Pharmacy Joint Venture" could be formed by one or more of the Marquis Parties and any third party, rather than with GHV only. *Id* at ¶ 5. It was reasonably foreseeable that the negotiations with GHV might not be successful and that Marquis would create a "Pharmacy Joint Venture" with a different third party, resulting in additional income to Marquis. Hence, the Agreement broadly defines a "Pharmacy Joint Venture" to include another type of entity such as Consonus.

The drafts of the Buy-Out Agreement are subject to differing interpretations. Plaintiffs point to early drafts of the Agreement which they believe reveal the parties' intent that the "Pharmacy Joint Venture" refers only to a joint venture with GHV/NeighborCare. For example, a December 11, 2001 draft of Section 9 provides:

> As of the date of this Agreement, certain of the Included Companies operate the [Marquis] Facilities. The Facilities are all owned or operated by Marquis, Marquis Suites or Included Companies in which the Marquis Parties or Steve Fogg are, or after the Closing of this transaction will be, the sole members. *Prior to the execution of this Agreement, the Marquis Parties had contemplated the Pharmacy Joint Venture Transaction. The Marquis Parties intend to pursue the Pharmacy Joint Venture* Transaction after the Closing of the transaction provided for in this Agreement. *In the event of the* **consummation** *by the Marquis Parties of the Joint Venture* Transaction and either a Pharmacy Distribution and/or a subsequent Pharmacy Sale, the Warts shall be entitled to additional consideration under this Agreement equal to the proceeds of such distribution or Pharmacy Sale, as applicable, multiplied by the Pharmacy Percentage....

Fogg Affidavit, Exhibit 7, Bates Nos. 200123-129, 200136 (emphasis added).

19 - OPINION AND ORDER

The highlighted text in this draft makes it clear that "the Pharmacy Joint Venture Transaction" in Section 9 refers only to the Marquis-GHV/NeighborCare joint venture. It states that Wart will receive consideration only in the event of "consummation" of "the Joint Venture Transaction." Only a transaction then being negotiated can be "consummated," and the only such transaction being negotiated was the Marquis-GHV/NeighborCare joint venture. Thus, according to this draft, Wart would only be entitled to a Pharmacy Distribution from that specific joint venture, and not from Consonus.

However, the parties, through their attorneys, exchanged at least 15 drafts of the Buy-Out Agreement. Based on the changes to Section 9 throughout those drafts, it is reasonable to infer that the parties were focused on Section 9, negotiated its terms, and carefully revised it multiple times. Plaintiffs could not have been unaware of those changes. As a result, the final draft is exactly what the parties intended. Yet it does not contain the same language as the December 11, 2001 draft. This change in the final draft could reasonably be interpreted to mean something different than the language used in the earlier drafts.

Because the parties have not submitted all of the drafts, it is difficult to track the changes in the drafts in the record in any logical fashion. For example, another draft dated January 18, 2002, states:

> Pharmacy Joint Venture. The Marquis Parties have been engaged in negotiations with a third party for the organization of the Pharmacy Joint Venture. If the Marquis Parties and *any* third party form *the* Pharmacy Joint Venture, the Marquis Parties will pay [Wart] a sum equal to . . . .

*Id* at Exhibit 8, Bates No. 20084 (emphasis added).

The language in the second sentence is identical to the relevant portions of Section 9 at issue.  To ascertain the parties' intent, it would be helpful to know how and why this language was changed and to compare all drafts of Section 9.

Plaintiffs also point to other drafts containing the language in the first sentence stating "are engaged (in negotiations)" as opposed to "have been engaged" (*id* at Exhibit 9, Bates Nos. 100204-05).  They believe that this distinction amounts to an even clearer reference to the Pharmacy Joint Venture then contemplated with GHV/NeighborCare.  However, Wart has already admitted that "a third party" in that sentence refers to GHV/NeighborCare.  The form of the verb in the first sentence does not influence the form of the verb in the second sentence and leaves the ambiguity intact.

Wart's position relies primarily on the inclusion of the words "or other entity" in the definition of a "Pharmacy Joint Venture."  This is a slim reed since Consonus is quite a different type of entity than Marquis was negotiating with GHV and was not designed to salvage Marquis' investment in SNALF.  But the admissible extrinsic evidence in the record, limited to the circumstances under which the Buy-Out Agreement was made, does not resolve the ambiguity created by the language in Section 9.

### D.    <u>Conclusion</u>

As discussed above, read alone and in context, the disputed terms of Section 9 are ambiguous.  Admissible extrinsic evidence creates a genuine issue of material fact as to whether the parties intended the "Pharmacy Joint Venture" to refer solely to the business arrangement being negotiated by Marquis with GHV/NeighborCare.  Because Section 9 is ambiguous, "the

trier of fact will ascertain the intent of the parties and construe the contract consistent with the

intent of the parties." *Yogman*, 325 Or at 361, 937 P2d at 1021 (citation omitted).

## <u>ORDER</u>

For the reasons stated above, Wart's Motion for Summary Judgment (docket # 16) is

DENIED.

DATED this 14th day of December, 2006.

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge
